# EXHIBIT A

STATE OF ILLINOIS )
               ) SS
COUNTY OF COOK )

FILED

MAR 23 2022

IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

### IN THE CIRCUIT COURT OF COOK COUNTY
### CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
                              )
            Plaintiff,       )    19 CR 474901
vs.                    )    Judge Paul S. Pavlus
                              )
                              )
SCOTT THOMAS             )
            Defendant.    )

### MOTION TO DISMISS THE INDICTMENT

i

## TABLE OF CONTENTS

I. Introduction ............................................................................................. 1-5

II. Grand Jury Testimony ............................................................................. 5-9

III. Discussion ............................................................................................... 9-27

    A. Legal Standard.................................................................................. 9-12

    B. The State's Grand Jury Presentation was Intentionally Misleading, Inaccurate, and Deceptive ............................................................. 12-19

        i. Activities at the Party and Mutual Flirtation.......................... 12-14

        ii. Omitted Testimony Regarding Clearly Consensual Acts...........14-16

        iii. Testimony Regarding Alleged "Penetration" ......................... 16

        iv. Testimony Regarding A.Z.'s Ability to Communicate and Form Rational Thoughts................................................. 16-18

        v. A.Z.'s Statements at the Hospital ............................................ 18-19

        vi. Deceptive Testimony Regarding "Enticement/Enduement"................... 19-20

        vii. Deceptive Testimony Regarding "Cuts and Abrasions"..........................20-21

    C. The State's Failure to Present Any Evidence as to the Aggravated Kidnapping Charges or Charges Alleging Bodily Harm............ 21-23

    D. The Counts Charging a Sex Offense as an Aggravating Predicate Failed to State an Offense ........................................................ 24-26

IV. Conclusion............................................................................................26-27

## TABLE OF AUTHORITIES

**Constitutional Amendments**

Ill. Const. Art. I § 2 ........................................................................................... 8

Ill. Const. Art. 1 ¶ 7 ........................................................................................... 8

U.S. Const. amend. V ........................................................................................ 1

U.S. Const. amend. VI ....................................................................................... 1

**Cases**

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1998)
........................................................................................................................ 10

*Hurtado v. California*, 110 U.S. 516 (1884)
.......................................................................................................................... 9

*People v. Brials*, 315 Ill. App. 3d 162 (1st Dist. 2000
........................................................................................................................ 25

*People v. Creamer*, 143 Ill. App. 3d 64 (4th Dist. 1986)
........................................................................................................................ 24

*People v. Cross*, 2019 IL App (1st) 162108
........................................................................................................................ 10

*People v. DeWeese*, 298 Ill. App. 3d 4 (1st Dist. 1988)
........................................................................................................................ 24

*People v. DiVincenzo*, 183 Ill.2d 239 (1998)
...................................................................................................................... 8, 9

*People v. Eyler*, 133 Ill.2d 173 (1999)
........................................................................................................................ 21

*People v. Fassler*, 153 Ill.2d 49 (1992)
.......................................................................................................................... 8

*People v. Finley*, 178 Ill. App. 3d 301 (1st Dist. 1988)
........................................................................................................................ 24

*People v. Hall*, 2019 IL App (1st) 162006-U
.......................................................................................................... 21

*People v. Hall*, 2014 IL App (1st) 122868
.......................................................................................................... 24

*People v. Haron*, 85 Ill.2d 261 (1981)
.......................................................................................................... 24

*People v. Hunter*, 298 Ill. App. 3d 126 (1st Dist. 1998)
.......................................................................................................... 8

*People v. Lamkey*, 240 Ill. App. 3d. 435 (1st Dist. 1992)
.......................................................................................................... 21

*People v. Lawson*, 67 Ill.2d 449 (1977)
.......................................................................................................... 11

*People v. McDonald*, 183 Ill.2d 239 (2016)
.......................................................................................................... 8

*People v. Oliver*, 368 Ill. App. 3d 690 (1st Dist. 2006)
.......................................................................................................... 8

*People v. Reimer*, 971 N.E.2d 1134 (1st Dist. 2012)
.......................................................................................................... 8

*People v. Rodgers*, 98 Ill. App. 3d 999 (1st Dist. 1981)
.......................................................................................................... 11

*People v. Rodgers*, 92 Ill.2d 283 (1982)
.......................................................................................................... 11, 20

*People v. Singuenza-Brito*, 235 Ill.2d 213 (2009)
.......................................................................................................... 21

*People v. Smith*, 91 Ill. App. 3d 523 (1980)
.......................................................................................................... 21

*People v. Thomas*, 171 Ill.2d. 207 (1996)
.......................................................................................................... 22

*People v. Ware*, 323 Ill. App. 3d 47 (2001)
.......................................................................................................... 21

*People v. Young*, 115 Ill. App. 3d 455 (2d Dist. 1983) ............................................................................ 21

*Russell v. United States*, 369 U.S. 749 (1962) ............................................................................ 23

**Statutes**

725 ILC 114-1 .................................................................. 1, 11, 23, 25

720 ILCS 5/10-2(a)(3) .................................................................. 20

720 ILCS 5/11-1.30 .................................................................. 23, 24

720 ILCS 5/11-1.60 .................................................................. 23, 24

720 ILCS 5/10-2(a)(3) .................................................................. 4

**Pattern Instructions**

Illinois Pattern Instruction No. 11.57 .................................................................. 23

Illinois Pattern Instruction No. 11.58 .................................................................. 23

Illinois Pattern Instruction No. 11.59 .................................................................. 24

Illinois Pattern Instruction No. 11.60 .................................................................. 24

## DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Defendant, **Scott Thomas,** by and through his attorneys, **Cheronis, Parente, & Levitt**, and **Rotunno & Giralamo**, respectfully moves this Court, pursuant to the Due Process and Effective Assistance of Counsel provisions of the United States Constitution and the Illinois Constitution, 725 ILCS 114-1(a), the inherent supervisory powers of the trial court, and the other authority cited herein, to dismiss the indictment with prejudice due to the state's intentionally misleading, inaccurate, and deceptive presentation to the grand jury, which precluded the return of a meaningful indictment, and because certain charges specified herein fail to state an offense.

In support of this motion, Scott Thomas, through counsel, submits the following:

## I. Introduction

Scott Thomas was a freshman at Northwestern University in the spring of 2019. On the evening of March 16, 2019, he attended a "World Cup Soccer Club" party at a friend's apartment with other students. A.Z., the complainant in this case, was also at the party. Both had been drinking and as reported by several witnesses, mutually flirting with each other and socializing. When the party ended around midnight, Mr. Thomas, A.Z., and other partygoers left in a group. A.Z. made a pact earlier that night with a friend that the two would leave the party and head home together when the time came. Rather than keeping that pact, however, A. Z. left the party with Mr. Thomas and four other friends. Additionally, when the group chose to go to a local Burger King restaurant, A.Z. decided to break away and leave with only Mr. Thomas—an unalarming decision to their friends because it was clear from their interactions during the party that both desired to engage in additional consensual sexual activity, described by one partygoer as a "hook up."

1

Over the course of the next hour or so, A.Z. and Mr. Thomas walked around campus, frequently engaging in physical contact, and on numerous occasions stopping to engage in additional and mutual acts of a physical and sexual nature. Video surveillance captured some but not all these interactions.[1] The video depicts the two holding hands at times, while at other times A.Z. is skipping along either in front of or next to Mr. Thomas. On numerous occasions the two can be seen mutually kissing, hugging, and engaging in other consensual activities. It is apparent that both students had been drinking, were mutually attracted to each other, and that each elected to engage in public displays of affection.

As the night progressed and the two walked through campus, A.Z., despite on occasion falling to the ground, would get back up and engage in affectionate consensual conduct with Mr. Thomas. In one such instance, while on Sheridan Road, after A.Z. fell, she immediately got back to her feet and began straddling and kissing Mr. Thomas as he stood and, eventually as he was seated on a bench. Furthermore, while on Sheridan Road, Mr. Thomas can be seen putting his hand inside A.Z.'s pants. She removes his hand and then proceeds to kiss Mr. Thomas. The two continue to engage in consensual activities without much regard for the fact that they were in public or the presence of individuals passing by on the street. This process repeats itself for some time, with the two meandering about as they make their way towards the other side of campus where they both resided, with frequent pauses and detours, A.Z. falling and getting back up, and the two engaging in continuing physical contact of a sexual nature.

For approximately forty minutes, after the two leave the area of Sheridan and Emerson, there has been no surveillance footage provided by the state to account for this timeframe. Despite this,

---

[1] Counsel is still investigating the possibility of filing a motion based upon the failure to preserve additional video evidence.

there was evidence in the possession of the state that established Mr. Thomas and A.Z. were continuing to engage in mutual consensual behavior. To that end a security guard supervisor overheard police radio chatter regarding drunk college students matching the description of A.Z. and Mr. Thomas. Upon seeing two individuals on campus matching that description, the security supervisor called the emergency operator to report seeing the two mutually kissing and hugging. The security supervisor was unsure if these were the two people that were trying to be located because he witnessed nothing concerning about their interactions. His call came in at 2:14 a.m. and he estimated observing them 15-20 minutes prior:

T  This is Travis. Yeah, hey Travis this is Allied Universal Guard Supervisor. Is that one that they were just radioing a little bit earlier I was on my way back within the last 15-20 minutes ago. I did see a couple making out, but they were outside. It looked like the lady had a white t-shirt white shirt on. Didn't look drunk to me, they were just kissing and making out. I don't know if that's the one.

   [u/i]

O  Where did you see that at?

T  Sheridan Road maybe right around going north near probably the church area.

O  Got it.

T  Right around the church area. I figured I'd let you know I don't know if it's the one you're looking for, but I figured I'd let you know because I did see somebody but as soon as they saw me walking, **they** were kissing and everything all over the place.

O  Gotcha. Anything other than the white shirt stand out?

T  Just the guy. I mean he was, I couldn't tell if he had brown or blondish hair, could have been a little on the blond side.

O  Gotcha I appreciate it I'll let my sergeant know alright?

3

T       I don't know if it's the one you're looking for, but it might be something.

O       Gotcha anything helps.

T       No that's about all I can tell you at this time.

O       Thank you

T       You got it.

At approximately 2:08 a.m., and consistent with the security guard supervisor's call, the two are again seen on camera near the entrance to the Jacobs Center at 2001 Sheridan Road. An interior building camera captured their interactions, but the vantage is partially blocked by windowpanes, unclear, and granular. Regardless, and within 8 to 13 minutes after the security guard supervisor's observations, the state alleges that Mr. Thomas had forcible sexual intercourse with A.Z. while being aware that she was too intoxicated to consent.

Three female graduate students who had been studying at the library happened to leave as Mr. Thomas and A.Z. were in front of the Jacobs Center. Their approach eventually brought them in view of Mr. Thomas and A.Z. Without any context of the preceding events as described above, they claim that they had witnessed a sexual assault occurring or "about to occur." Police arrived at the scene and determined that A.Z. was intoxicated. A.Z. made several statements at that time, including offering her identifying information, that she didn't want any help, and that "this could ruin her legal career." Mr. Thomas was detained, questioned, arrested, and released. A.Z. was taken to a hospital where her blood alcohol level was later determined to be .294.

Mr. Thomas now stands charged in a 64-count indictment alleging numerous criminal acts. The indictment was obtained by presenting the case to the grand jury through Northwestern Officer Sanghoon Lee. Operating without even the pretense of fairness, the state elicited from Officer Lee

4

intentionally misleading, inaccurate, and deceptive testimony while at the same time improperly omitting critical facts that due process and fundamental fairness required be presented. Instead of putting the actual objective facts surrounding A.Z. and Mr. Thomas' evening before the grand jury and allowing the grand jury to make an informed decision regarding whether a crime had occurred, the state allowed Officer Lee to put forth a false narrative that left the grand jury with an inaccurate, incomplete and fundamentally unfair version of what actually occurred on the night in question.

As detailed below, the state's intentionally misleading, inaccurate, and deceptive presentation prevented the grand jury from exercising its time-honored historic function of being a neutral and protective body of the citizenry and bulwark against unchecked executive and police power as it prevented the grand jury from making an informed and meaningful decision about whether to return the state's proposed indictment. Moreover, the counts charging a sex offense as an aggravating predicate failed to state an offense. Mr. Thomas, through counsel, is therefore moving to dismiss the indictment in its entirety with prejudice as a failure to do so would result in a gross miscarriage of justice.

II.     Grand Jury Testimony

1.      As a result of the allegations of March 16, 2019, Mr. Thomas was charged in a 64-count indictment with numerous offenses including aggravated criminal sexual assault in violation of 720 ILCS 5/11-1.30(a)(2), aggravated kidnapping and aggravated criminal sexual abuse charges in violation of 720 ILCS 5/10-2(a)(3) and 11-1.60.

2.      Officer Sanghoon Lee was the state's only testifying witness before the grand jury. A copy of the transcript of his April 22, 2019, grand jury testimony is attached hereto as Exhibit A.

3.      Officer Lee testified that he was assigned to investigate an alleged criminal sexual assault that occurred on March 16, 2019, between 1:10 a.m. and 2:15 a.m., at the location of 2001 Sheridan Road, Evanston, Illinois, on the Northwestern University campus. Ex. A at p. 3. He relayed that his investigation revealed that Mr. Thomas and A.Z. attended a social gathering on or near the university campus beginning during the evening of March 15, 2019 and continuing into the early hours of March 16th. *Id.*

4.      Officer Lee testified that A.Z. was consuming alcohol at the party, and at some point, left along with Mr. Thomas. *Id.* at p. 4. Campus surveillance footage reviewed by Officer Lee depicted Mr. Thomas and A.Z. walking together along Sheridan Road. *Id.* At one point the video depicted A.Z. fall and Mr. Thomas pick her up, and at another point in time the two stopped near the corner of Sheridan Road and Emerson Road for approximately 10 minutes. *Id.*

5.      Officer Lee continued, stating that his investigation revealed that A.Z. was highly intoxicated, unable to keep her balance, and required Mr. Thomas to lift her up when she had trouble standing. *Id.* at pp. 4-5. Furthermore, according to Officer Lee, Mr. Thomas physically "yank[ed]" A.Z. or moved her about, and while he was holding her up, inserted his fingers down the front and inside of the complainant's pants and into her vagina, as well as placing his hand on the outside of her pants on her vagina. *Id.* at p. 5.

6.      Officer Lee further stated that he witnessed Mr. Thomas place his hand on the outside of A.Z.'s pants over her vagina on one additional occasion, and that his investigation also revealed Mr. Thomas placed his hand on A.Z.'s breast from the outside of her shirt while holding her up. *Id.* at p. 6. A.Z. appeared, according to Officer Lee, to repeatedly try to "get out of" Mr. Thomas' grasp and attempted to remove his hand from her vagina on multiple occasions. *Id.* The

6

two subsequently walked out of view of the surveillance camera and no video footage was provided until approximately 47 minutes later near the doorway to the Jacobs Center located at 2001 Sheridan Road. *Id.*

7. Without further elaboration—or any elaboration—Officer Lee testified that his investigation revealed that Mr. Thomas "enticed or induced" A.Z. to go to the Jacobs Center and that Mr. Thomas "moved" A.Z. from Emerson and Sheridan to the Jacobs Center. *Id.* at p. 7.

8. Officer Lee reviewed the video surveillance from the Jacobs Center, and according to his interpretation, it revealed that Mr. Thomas helped A.Z. stand up while attempting to open the door to enter the Jacobs Center. *Id.* Mr. Thomas was unable to do so because the door was locked. *Id.* Mr. Thomas then moved A.Z. against the door and positioned her so that she was facing towards the door with her back to him. *Id.* at p. 8. Mr. Thomas lowered her pants and underwear, removed his pants, and after positioning himself behind her, thrusted into A.Z. *Id.* Again, without elaboration, and though it is not remotely clear from the video, Officer Lee averred that his investigation revealed that Mr. Thomas' penis had contact with both A.Z.'s vagina and anus, and that he was holding her up to prevent her from falling while this occurred. *Id.* A.Z. did fall to the ground and on her face, and Mr. Thomas pulled her back onto her feet by her arms and repositioned her against the door. *Id.* at p. 9. Officer Lee stated that there was again contact between Mr. Thomas' penis and the complainant's vagina and anus, with her again being held to prevent falling although she did ultimately fall over again. *Id.*

9. Officer Lee next testified that Mr. Thomas pulled up his pants and zipper while A.Z. was laying on the ground. *Id.* at p. 10. Other individuals came onto the scene and began pulling up A.Z.'s pants and underwear after walking out of the library and observing the two. *Id.* The witnesses

7

"observed the acts to be non-consensual based on [A.Z.'s] body appearing to be lifeless." *Id.* Upon arriving they called out, which is when Mr. Thomas stopped "thrusting." A.Z. then fell to the ground, and Mr. Thomas pulled up his pants and readjusted himself. *Id.* A NUPD officer was flagged down and attempted to have a conversation with A.Z. but could not because A.Z. "could barely speak and could only mumble." *Id.* at p. 11.

10.     After A.Z. was taken to the hospital, her blood alcohol concentration was found to be .294. *Id.* A.Z. had numerous "con[t]usions, abrasions, scratches, and cuts about her body." *Id.*

11.     To conclude his testimony, Officer Lee stated that his investigation revealed the following:

- Mr. Thomas used his superior size and strength to move A.Z. about, hold her up, pick her up, and position her against various obstacles or buildings while he placed her [sic] fingers inside of her vagina, his hands on her vagina and breasts, and his penis against her vagina and anus;
- During the entire incident Mr. Thomas knew A.Z. was unable to give knowing consent and was not a willing participant based upon her visible intoxication;
- A.Z. fell over numerous times during the entire incident and Mr. Thomas would pick her up and she would fall again, all causing bodily harm;
- As a result of Mr. Thomas holding and positioning A.Z. while performing various sexual acts A.Z. sustained injuries;
- While moving A.Z. about, Mr. Thomas would insert his fingers into her vagina, place his hands on her vagina and breasts, or put his penis against her vagina and anus; and
- While inserting his fingers into A.Z.'s vagina, placing his hands on her vagina and breasts, or putting his penis against her vagina and breasts [sic], A.Z. was confined against her will. *Id.* at pp. 11-12.

12.     Mr. Thomas now moves this Court to dismiss the indictment against him based upon the state's intentionally misleading, inaccurate, and deceptive presentation to the grand jury, and as will be described further, certain counts separately warrant dismissal for failing to state an offense.[2]

## III.    Discussion

### A. Legal Standard

13.     Article I, Section 2 of the Illinois Constitution guarantees that no person shall be deprived of their liberty without due process of law. The Fifth Amendment right to indictment by a grand jury has not been incorporated on the states through the Due Process Clause of the Fourteenth Amendment. *See Hurtado v. California*, 110 U.S. 516 (1884). However, Article I, Section 7 of the Illinois Constitution provides that no person may be held to answer to a criminal offense unless he has either been indicted by a grand jury or given a prompt preliminary hearing to establish probable cause where charges have been directly presented to the circuit court by complaint or information filed by the State's Attorney.

14.     The statutory bases to dismiss an indictment in Illinois are provided for in 725 ILCS 5/114-1. *See also People v. Starks*, 106 Ill. 2d 441 (1985) (affirming dismissal of indictment with prejudice pursuant to the inherent supervisory powers of the trial court); *People v. Hunter*, 298 Ill. App. 3d 126, 130 (1st Dist. 998) ("[w]hile Section 114-1(a) of the Code does not contain a specific provision addressing the court's ability to dismiss a criminal charge for a due process violation, this ability is nevertheless recognized as part of the trial court's inherent authority to guarantee the defendant a fair trial"). Dismissal is necessary whenever a defendant "has suffered a prejudicial denial of due process" based upon the state's grand jury presentation. *People v. Oliver*, 368 Ill. App. 3d 690,

---

[2] Attached with the substantive exhibits filed under seal are the indictment and a chart detailing the counts of the indictment and the requested grounds for dismissal.

9

694 (1st Dist. 2006) (citing *Hunter*, 298 Ill. App. 3d at 130). This rule naturally applies to situations in which the prosecutor intentionally misleads the grand jury: "[t]he due process rights of a defendant may be violated if the prosecutor deliberately or intentionally misleads the grand jury, uses known perjured or false testimony, or presents other deceptive or inaccurate evidence." *Id.* (quoting *People v. DiVincenzo*, 183 Ill.2d 239, 257 (1998)); *see also People v. McDonald*, 183 Ill.2d 239 (2016); *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256-57 (1998). This rule regarding dismissal holds equally firm regardless of whether the prosecutor acted intentionally or not. *See Oliver*, 368 Ill. App. 3d at 695-96 (affirming dismissal with prejudice while acknowledging that "a strong case could be made that the prosecutor deliberately or intentionally misled the grand juries . . . [but] the trial court did not resolve that issue"). In fact, in *Oliver*, the Court expressly held that no showing of intent is required: "we hold that the State's presentation of deceptive evidence denied defendant due process, regardless of whether the deception was intentional." *Oliver*, 368 Ill. App. 3d at 696. Ultimately, all that is necessary to warrant a dismissal of an indictment is a showing "that the state prevented the grand jury from returning a meaningful indictment by misleading it or coercing it." *DiVincenzo*, 183 Ill. 2d at 258.

15. The prosecutor's role before the grand jury is, in part, to act as an advisor to the grand jury and present both the law and the proposed charges against the defendant. *People v. Reimer*, 971 N.E.2d 1134, 1141 (1st Dist. 2012) (citing *DiVincenzo*, 183 Ill.2d at 254). As a result, if the prosecutor misstates the applicable law to the grand jury, and that misstatement results in actual and substantial prejudice to the defendant, dismissal of the indictment is required. *Id.* at 1143 (citing *People v. Fassler*, 153 Ill.2d 49, 58 (1992). This is true, again, whether the state's attorney acted intentionally or by negligence, accident, or mistake. *Id.* at 1144. Likewise, Due Process requires

10

dismissal of an indictment when the grand jury presentation prevents the return of a "meaningful" indictment. *See People v. Cross*, 2019 IL App (1st) 162108, ¶ 55 (internal citations and quotations omitted); *see also DiVincenzo*, 183 Ill.2d at 255.

16.     Illinois courts have further held that an indictment must be dismissed if no evidence was presented to the grand jury connecting the accused to the offense charged. This issue was most prominently addressed by the First District in *People v. Rodgers*, 98 Ill. App. 3d 999 (1st Dist. 1981), and the Illinois Supreme Court in *People v. Rodgers*, 92 Ill.2d 283 (1982). At the trial level, the defendant sought to dismiss an indictment where no evidence was presented to the grand jury. In upholding the trial court's refusal to dismiss the indictment, the First District initially observed that the failure to present evidence before the grand jury is not among the grounds to dismiss an indictment specified by § 114-1(a), however, trial courts do have authority to dismiss indictments outside of those grounds where there has been an "unequivocally clear denial of due process." *Id.* at 1001 (citing *People v. Lawson*, 67 Ill.2d 449, 456 (1977).

17.     The defendant conceded the point, but argued his case presents a different issue, as *no evidence* was presented to the grand jury during the course of his investigation. *Id.* The First District disagreed and affirmed the trial court's refusal to dismiss the indictment because in its view, the distinction between presenting a grand jury insufficient evidence or no evidence "appears to be one without a difference." *Id.*

18.     The Illinois Supreme Court, in turn, disagreed with this holding. It first recognized that grand juries are expected to return a true bill only if there is probable cause to believe that the defendant has committed an offense. *Id.* at 288. Thus, in fairly harsh words, the Illinois Supreme Court concluded that for a grand jury "[t]o return a true bill where there is absolutely no evidence

11

connecting the accused to the offense charged would be an abdication of the important responsibility with which the grand jury has been entrusted." *Id.* Trial courts therefore have inherent authority to review grand jury transcripts and determine whether any evidence has been presented to connect the accused to the offense charged. *Id.* at 290.

19.     When such an allegation is raised in a motion to dismiss, the burden shifts to the state to point out "any direct or circumstantial evidence in the transcript from which an inference of criminal conduct could be derived." *Id.*

**B. The State's Grand Jury Presentation was Intentionally Misleading, Inaccurate, and Deceptive.**

20.     Through its omissions, misrepresentations and deceptions, the state's grand jury presentation proved misleading and inaccurate to the point where it precluded the meaningful return of an indictment and deprived Mr. Thomas of his Due Process rights and resulted in a miscarriage of justice.

**i. Activities at the Party and Mutual Flirtation**

21.     Initially problematic is the misleading depiction of Mr. Thomas' and A.Z.'s activities at the party itself. While Officer Lee's testimony is replete with references to A.Z.'s inebriated state, at no point does he disclose the fact that Mr. Thomas, too, was drinking at the party, as he was aware from witness interviews and interactions with Mr. Thomas on scene. This information provides important context to Mr. Thomas and A.Z.'s interactions, without which the grand jury was given a false sense that the situation carried predatory overtones of a sober individual taking advantage of a heavily intoxicated person.

22.     Moreover, the grand jury transcript reads as if Mr. Thomas and A.Z. had no prior relationship nor had they engaged in consensual activities before the alleged violent sexual assault

described to the grand jury. Officer Lee was fully aware, however, that while at the party, A.Z. confided in her friend, M.H., that she was attracted to Mr. Thomas and that, although she had initially planned on leaving with Individual A, she changed her mind and stated she would be voluntarily leaving with Mr. Thomas. Officer Lee was also aware that when it came time to leave the party, Mr. Thomas, A.Z., and three other individuals initially set out to find a late-night fast-food meal. However, it was at this point that Mr. Thomas and A.Z. mutually agreed to set off alone together—a fact Officer Lee remained aware of but nonetheless omitted.

23.     Through the course of witness interviews during the week following the incident, it was made known to law enforcement that the rationale for Mr. Thomas and A.Z. splitting from the group was because they intended to "hook up"; that is, to engage in mutually consensual sexual activities.

24.     For example, C.B., the party's host, explained during an interview that was recorded on Officer Lee's body worn camera that Mr. Thomas and A.Z. were both intoxicated and left together for "Burger King" as part of "a big group." *See* Exhibit B. And more importantly, Officer Lee and other officers interviewed L.L., another partygoer and part of the group that left at the same time as Mr. Thomas and A.Z. In Officer Lee's police report he wrote that L.L. explained during an interview, which was also recorded, that he "observed both Thomas and [A.Z.] mutually flirting during the party," and as the two went to separate from the group, "he knew they were going to 'hook up,'" and A.Z. "seemed fine and not to the point of falling over" and that their interactions looked "consensual." *See* Exhibit C (L.L. Interview; Exhibit D (Lee 3/19/19 Report). Witness M.H also relayed that A.Z. has planned to leave with her, but at the last minute decided to leave with Mr.

13

Thomas. *See* Exhibit D (Lee 3/19/19 Report). Based on the context of the evening, L.L. and everyone else "were ok with that." No details of these interviews were disclosed to the grand jury.

25. This intentional omission was particularly egregious. First, the police had information from a witness who explained that A.Z. seemed in control, which contradicts the state's assertion that Mr. Thomas knew (because it was obvious) that A.Z. was too drunk to consent. Second, the police knew that Mr. Thomas was also drinking that evening an important fact that was never presented to the grand jury. Only mentioning that A.Z. was drinking left the grand jury with an incomplete, and inaccurate, depiction of the event. Moreover, the police were in possession of evidence that individuals who observed the two together believed, based on their mutual interactions, that they were going to engage in some form of mutually desired romantic or sexual activity. These omissions were deceptive and precluded the grand jury from returning a meaningful indictment.

### ii. Omitted Testimony Regarding Clearly Consensual Acts

26. Regarding their walk about Sheridan Road and around campus, Officer Lee testified to multiple instances of alleged forced sexual contact perpetrated by Mr. Thomas allegedly depicted on surveillance video, and as recounted above, A.Z.'s various efforts to rebuff Mr. Thomas's advances. Those videos were not shown to the grand jury or made available to it. Had they been it would have been clear to the grand jury that *before, during, and after* those alleged unwanted sexual advances on the way to the Jacobs Center, A.Z. is seen enthusiastically climbing upon Mr. Thomas, kissing him, touching him, holding his hand, and even straddling him. *See* Exhibit E. For example, although Officer Lee recounted how the complainant "removed" Mr. Thomas's hand from her pants, he failed to recount that just seconds after she removed his hand from her pants she was

14

kissing and straddling Mr. Thomas while the two were standing and later as Mr. Thomas sat on a bench on the corner of Sheridan Road and Emerson Avenue. *See id.* Remember, Officer Lee testified that during "the entire incident" which includes the aforementioned activity, Mr. Thomas *knew* that "A.Z. was unable to give consent and was not a willing participant based upon her visible intoxication." Certainly, evidence that A.Z. was a willing participant in kissing and straddling Mr. Thomas during the alleged *incident* calls into question if not outright refutes both the claim that Mr. Thomas knew A.Z was unable to give consent and that she was not a willing participant. Instead of stating any facts that would have offered an honest look at the evidence, the state deceptively and inaccurately disclosed what they characterized as unwanted contact and the ostensibly unwanted contact alone. In doing so the event was portrayed in an entirely misleading way—devoid of any context or evidence that A.Z. was actively engaging in consensual activity with Mr. Thomas.

27. The failure to show the videos or provide the grand jury with the true context surrounding the alleged assault was intentional. Officer Lee painted a picture of A.Z. having absolutely no agency throughout the entire encounter. However, as the objective evidence makes clear, by contrast, she was kissing, straddling, and otherwise making sexual advances towards Mr. Thomas frequently and repeatedly throughout the night. Officer Lee, for example, testified that A.Z., on multiple occasions tried to "get out of his grasp", yet failed to explain that soon after was kissing Mr. Thomas. All of that this information was kept from the grand jury, and in its place, Officer Lee painted an inaccurate version of the events to support his highly questionable conclusion that Mr. Thomas was aware of A.Z.'s inebriated state to the point that he should have known she could not consent. In any event, the grand jury was deprived of this basic yet critical information and thus

15

could not have made its own, independent assessment, and therefore could not return a meaningful indictment.

### iii. Testimony Regarding Alleged "Penetration"

28.     Officer Lee testified inaccurately and erroneously as to a critical and material element of the alleged offense- penetration.  Whether or not it is ultimately determined, as we assert, that it was intentionally false, his inaccurate statement precluded the grand jury from returning a meaningful indictment.  To that end, Officer Lee testified that on at least two separate occasions Mr. Thomas penetrated A.Z.'s body. Officer Lee testified that Mr. Thomas was seen on the video putting his hand inside A.Z.'s pants as they were on Sheridan Road, and next during the alleged assault at the Jacobs Center. Officer Lee did so despite the grainy, non-dispositive surveillance video he viewed but failed to show the grand jury.  This unsupported testimony is particularly significant because penetration, of course, is an essential element of aggravated criminal sexual assault charge.  Moreover, this improper presentation wrongfully, but directly and substantially affected the deliberations of the grand jurors warranting a dismissal with prejudice.

### iv. Testimony Regarding A.Z.'s Ability to Communicate and Form Rational Thoughts

29.     Equally inaccurate and misleading was Officer Lee's testimony that A.Z. could not speak but only mumble after she and Mr. Thomas were discovered outside of the Jacobs Center. Officer Lee described A.Z. as essentially half conscious and devoid of the power of speech. Problematically, the evidence that Officer Lee and the state possessed was materially different. Specifically, the state knew that A.Z. communicated to multiple individuals on scene that she was a Northwestern student and was concerned that this incident would cause her trouble in her future

16

career aspirations. As noted below, these statements show rational and calculated thoughts by A.Z. and were certainly not "mumbles" as Officer Lee testified to in front of the grand jury.

30. NUPD Officer Carter, in a March 16, 2019, report, acknowledged that while on scene, A.Z. looked intoxicated, however she was able to communicate that she was a Northwestern University student. *See* Exhibit F. E.H., one of the three witnesses who observed Mr. Thomas and A.Z. at the Jacobs Center, submitted a Sexual Misconduct Reporting Form on March 16, 2019, at 3:47 a.m. that averred the A.Z. informed her she was a freshman and lived in the "[Sargent Hall]" dorm. "She did not want to tell the police any information because she was afraid of getting in trouble." Exhibit G. Another of the witnesses, R.T., learned on scene from A.Z. that although she was a freshman, "[s]he said that . . . [she] had enough credits to be a sophomore." *Id.* The third responding individual, M.R., reported that A.Z. "kept saying that she was OK" and that "she did not want the witness holding her." *Id.* After the EMTs arrived, M.R. reported that the A.Z. "did not want to go with them," she "was very upset," and "saying that we didn't understand and that this would ruin her legal career." *Id.* Moreover, according to the arriving E.M.T.s, A.Z. was being uncooperative, again stated "she didn't want to get anyone in trouble" and refused (a conscious choice) further assessment. (See Exhibit H, Prehospital Care Report 3/16/19). All of these statements demonstrated A.Z.'s cognition, awareness, and decision-making capability, and should have been provided to the grand jury, instead the grand jury was falsely informed that A.Z. could not speak and could only mumble. This is especially true considering the claims that Mr. Thomas was aware A.Z. was too drunk to consent. Rather than provide accurate information, the state presented inaccurate information that went to the heart of the alleged offense. The state was in

17

possession of much information that showed A.Z. (through her statements) reflected awareness and cognition at the relevant time but *made the decision* to keep those from the grand jury.

31.     Officer Lee's testimony further failed to acknowledge that emergency radio communications between law enforcement and state personnel, in turn, acknowledge that shortly after arriving on scene, the investigators were able to obtain A.Z.'s name and spelling for her name, her dorm of residence with specific room number included, and date of birth. The grand jury was thus undeniably misled by misrepresentations regarding her ability to speak and form rational thoughts including her fear that this situation "could ruin her legal career." This is particularly troubling because the "omitted" information tends to establish that A.Z. formed a cogent thought regarding how being caught intoxicated on campus could affect her eventual, desired, and carefully planned legal career.[3] This is materially distinct from Officer Lee's sworn testimony that A.Z. was "mumbling and not being able to talk." Through this deception, again, Officer Lee presented only portions of testimony that fully supported his narrative while omitting facts that were necessary to the return of a meaningful indictment, not to mention the process carrying even the pretense of basic fairness.

### v. A.Z.'s Statements at the Hospital

32.     Furthermore, at 12:05 p.m. the same day as the alleged incident, Officer Lee personally visited A.Z. at the hospital along with NUPD Commander Benson. At that time, A.Z. reported consuming only "three beers and three shots of tequila throughout the night," and that she did "not believe someone had tampered with her beverages with external chemicals." As Officer Lee and the state knew or should have known, those medical records indicate that at 11:12 a.m. that

---

[3] M.H. explained during her interview that she knew A.Z. from moot court, a common extracurricular activity for those who intend to go into law.

morning, NUPD Commander Benson was alerted to A.Z.'s awake status, and that A.Z. stated she is at the hospital because "I'm drunk," "I remember everything last night," and when asked who she was with the night before, shot back: "why do you want to know?" *See* Exhibit J (Officer Lee 3/16/19 Report); Exhibit K (Medical Records). To that end, later on the same day, A.Z. stated that she remembered everything and refused to tell the police who she was with the night before.[4] A.Z.'s refusal to speak to the police and refusing to tell them who she was with the night before is not at all consistent with the narrative presented to the grand jury, which appears to have been purposely elicited in such a fashion, but in any event precluded the grand jury from returning a meaningful indictment.

### vi.   Deceptive Testimony Regarding Enticement / Inducement

33.    Officer Lee also testified that Mr. Thomas "enticed or induced" A.Z. to go to the Jacobs Center and that Mr. Thomas "moved" A.Z. from Emerson and Sheridan to the Jacobs Center. There is *no video evidence* that supports this claim. To the extent that Officer Lee claimed his investigation revealed as much his testimony on the point was false.

34.    And Officer Lee was in fact aware that this evidence was false. This point is established by a very significant 911 call made by a supervisor with a private security guard company in the area. Exhibit H. That call came in at 2:14 a.m., and it is clear from the context that he overheard emergency communications regarding NUPD's efforts to locate Mr. Thomas and A.Z. The security supervisor noted that he observed the pair 15-20 minutes prior, setting the time of his observation between 1:59 a.m. and 2:04 a.m. approximately (just before their arrival at the Jacobs Center at 2:08 a.m.). He called because he "figured I'd let you know . . . because I did see somebody

---

[4] While it was not included in Officer Lee's testimony, A.Z. later claimed while talking to police to have no memory of any events that transpired after she left the party.

19

but as soon as they saw me walking, they were kissing and everything all over the place." The supervisor went on to give a matching physical description of A.Z. and Mr. Thomas, and though he was not sure they were who investigators were looking for—because of the consensual and unalarming nature of their interaction—he repeatedly emphasized the fact that they were mutually kissing and touching,[5] that the "lady" in the "white t-shirt" "didn't look drunk to [him], they were just kissing and making out," and that he witnessed them on Sheridan Road heading north around the church area. *See* Exhibit I.

35.    The description offered by the private security supervisor matches the description, location, and previously recorded actions of Mr. Thomas and A.Z. This too was concealed from the grand jury. Instead, Officer Lee stated only that his investigation revealed that Mr. Thomas kidnapped A.Z., as opposed to walking with her while kissing and holding hands.

### vii.  Deceptive Testimony Regarding "Cuts and Abrasions"

36.    Also problematic was the claimed source of the cuts and abrasions A.Z. accrued throughout the night. As Officer Lee claimed and as was charged in numerous counts of the indictment, it was presented to the grand jury that those were the result of harmful, physical contact from Mr. Thomas—essentially that he caused these injuries. Officer Lee stated that the injuries were a result of "Scott Thomas holding and positioning A.Z." As the videos make clear, any cuts, bruises, or abrasions that may have resulted were the product of A.Z.'s own self-inflicted falls that were separate and apart from Mr. Thomas. In reality, his efforts to "hold her up" or "move" her were intended as helpful and to keep her freely mobile—the opposite of confinement. In fact, on at least

---

[5] The omission of this fact is also relevant to the subsection (B)(ii) above as it further demonstrates the mutual and consensual nature of the activities of that evening.

one occasion depicted on the video Mr. Thomas caught A.Z. as she was falling backwards, potentially helping to avoid serious injury.

37.     The failure to disclose this evidence coupled with the intentionally misleading, inaccurate and deceptive testimony presented, entirely deprived the grand jury of the ability to return a meaningful indictment. Dismissal with prejudice is therefore required.

### C. The State's Failure to Present Any Evidence as to the Aggravated Kidnapping Charges or Charges alleging Bodily Harm

38.     As previously noted, when the defendant alleges that no sufficient evidence was presented to the grand jury regarding any of the charges, the burden shifts to the state to point out "any direct or circumstantial evidence in the transcript from which an inference of criminal conduct could be derived." *People v. Rodgers*, 92 Ill.2d at 290.

39.     The instant grand jury presentation supporting counts 43-46 involved no evidence that Mr. Thomas "kidnapped" A.Z. in any respect. Specifically, no evidence was presented that Mr. Thomas used force to carry A.Z from one place to another or that A.Z. was secretly confined. 720 ILCS 5/10-2(a)(3).

40.     There was first and foremost no evidence at all that Mr. Thomas intended to "secretly confine" A.Z. but quite the opposite. Aside from attending an open party with significant turnout from numerous mutual friends and acquaintances, the two spent the later part of the evening walking about the open, conspicuous, and frequently traveled Sheridan Road. Unsurprisingly, surveillance footage depicted the two carrying out their activities and frequent instances of romantic physical contact without any regard or concern for the presence of myriad other individuals passing by—none of whom did anything more than gawk or take a second glance as they continued on their way. From there, as noted, Mr. Thomas and A.Z. arrived at a well-lit, public campus building, the

21

Jacobs Center.[6] Moreover, after arriving, Mr. Thomas attempted to open the door and enter this well-lit, public, and occupied academic campus building. In the first instance, then, there was no evidence of any intent to secretly confine the complainant and thus the grand jury presentation was deficient and misleading. Again, the state omitted the critical information from the security supervisor who observed them mutually kissing on the way to the Jacobs Center.

41.     The lack of proof of this element is especially apparent upon recalling that "a defendant cannot be convicted of kidnapping where asportation or confinement is merely incidental to another crime." *People v. Hall*, 2019 IL App (1st) 162006-U, ¶ 28 (citing *People v. Eyler*, 133 Ill.2d 173, 199 (1999)). Relevant factors to this analysis include: "(1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during another offense; (3) whether the detention or asportation was inherent in the separate offense; and (4) whether the detention or asportation created a significant danger that was independent of the danger posed by the separate offense." *Id.* at ¶ 29 (*People v. Smith*, 91 Ill. App. 3d 523, 529 (1980)). It is fair on this point to recognize that an allegation including asportation occurring before—not during—the sexual assault is at times sufficient to plead kidnapping as a separate offense. *See People v. Singuenza-Brito*, 235 Ill.2d 213, 226 (2009); *People v. Ware*, 323 Ill. App. 3d 47, 56 (2001). But even so, detention has also been found to be inherent in the commission of aggravated criminal sexual assault. *See. Lamkey*, 240 Ill. App. 3d at 440; *People v. Young*, 115 Ill. App. 3d 455, 470 (2d Dist. 1983) (the act of grabbing the victim and throwing her against the wall was inherent in the rape itself since the victim had to be restrained in some way to accomplish the rape and the detention lasted only for the duration of the

---

[6] *See* https://www.kellogg.northwestern.edu/facilities/jacobs-center.aspx (last accessed July 29, 2021). Photographs of the Jacobs Center are attached hereto as Exhibit K.

rape). In this case, given the fact that the indictment charged so many ostensible acts "separate from the acts set forth in the other counts," whatever they may be, the allegation falters even more significantly. That is, the state has charged virtually every instance of alleged sexual contact—despite their consensual nature—as a count of sexual assault or abuse, which means that the entirety of Mr. Thomas' and A.Z.'s physical interactions (or any that could be construed as force or enticement) to necessarily have occurred within and during the sexual assault.

42.     Next, the counts alleging that Mr. Thomas utilized *force or the threat of force, or deceit or enticement* to attempt to secretly confine A.Z. are likewise deficient. There was, again, no evidence whatsoever that Mr. Thomas forced or threatened A.Z. to leave the party with him or proceed to any other location, nor was there any evidence of deceit or enticement. Rather, and again, as L.L. informed Officer Lee, when Mr. Thomas, A.Z., and the rest of the group left the party, everyone understood that Mr. Thomas and A.Z. mutually agreed to separate for the express purpose of "hooking up." Moreover, in the time just preceding their arrival at the Jacobs Center, a security supervisor  observed them kissing and walking. As such, the counts of the indictment charging kidnapping or incorporating the allegation of kidnapping require dismissal.[7]

43.     Finally, the same is true with respect to the counts of the indictment alleging that Mr. Thomas caused bodily harm to A.Z. in the form of "contusions, abrasions, scratches, and cuts."[8] There is no evidence at all that Mr. Thomas "caused" these injuries, but on the contrary, that they occurred because of her voluntary alcohol consumption and were self-inflicted as the surveillance footage corroborates.

---

[7] Those counts include counts 8, 9, 10, 11, 12, 13, 14, 29, 30, 31, 32, 33, 34, 35, 43, 44, 45, 46, 50, 51, 52, 59, 60, and 61.

[8] Those counts include counts 1, 2, 3, 4, 5, 6, 7, 22, 23, 24, 25, 26, 27, 28, 47, 48, 49, 56, 57, and 58.

23

**D. The Counts Charging a Sex Offense as an Aggravating Predicate Failed to State an Offense.**

44.     Separate and apart from the constitutionally deficient grand jury presentation, Counts 15, 16, 17, 18, 19, 20, 21, 36, 37, 38, 39, 40, 41, and 42 charge aggravated criminal sexual assault in violation of 720 ILCS 5/11-1.30(a)(4), and allege criminal sexual abuse as the "other felony" that constitutes the "aggravating" element of the offense. Likewise, counts 53, 54, 55, 62, 63, and 64 charge aggravated criminal sexual abuse in violation of 720 ILCS 5/11-1.60(a)(6) and allege criminal sexual assault as the "other felony." As unique and creative as this charging approach may be, criminal sexual assault and abuse are essentially the same offense, or the lesser included or greater offense respectively. Lesser included offenses do not constitute "any other felonies"—which is the "aggravating" factor the state alleged. These counts of the indictment fail to allege all elements of the charged offenses.

45.     Indictments must contain a plain, concise and definite written statement of the essential facts constituting all elements of the offense charged, and fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense. *See Russell v. United States*, 369 U.S. 749, 763 (1962). Acknowledging these constitutional requirements, the Illinois Legislature has mandated that, upon written motion by the defendant, trial courts dismiss an indictment where it fails to state an offense. 725 ILCS 114-1(a)(8).

46.     Aggravated criminal sexual *assault* in violation of 720 ILCS 5/11-1.30(a)(4) as charged, requires proof of the following elements:

(1) that the defendant committed an act of sexual penetration.

(2) through the use or threat of force; knowing that the victim was unable to understand the nature of the act or give knowing consent; and

(3) the defendant did so during "the course of committing or attempting to commit *any other felony.*"

*Cf.* Illinois Pattern Instruction No. 11.57. Illinois Pattern Instruction No. 11.58 specifically requires the jury to be instructed—and the state to prove—that "the act of sexual penetration was perpetrated during the course of the commission of the offense of [the specified predicate] by the defendant." Ultimately, as is plain from subsection (a)(4) of 720 ILCS 5/11-1.30, the predicate offense must be a separate or "any other felony."

47.     Aggravated criminal sexual *abuse* is no different in this respect. 720 ILCS 5/11-1.60(a)(6) requires proof that the defendant committed criminal sexual abuse, the identical offense involving sexual conduct as opposed to penetration, "during the course of committing or attempting to commit *any other felony.*" Thus, the elements of the offense require proof of the following:

(1) that the defendant committed an act of sexual conduct.

(2) through the use or threat of force; knowing that the victim was unable to understand the nature of the act or give knowing consent; and

(3) the defendant did so during "the course of committing or attempting to commit *any other felony.*"

*Cf.* Illinois Pattern Instruction No. 11.59 and 11.60.

48.     Under similar facts, where the "aggravating" factor is merely ostensible proof of "any other felony," aggravated criminal sexual abuse and criminal sexual abuse are to be considered a lesser included offense of aggravated criminal sexual assault. *See, e.g., People v. Finley*, 178 Ill. App. 3d 301, 306 (1st Dist. 1988) ("[w]e believe aggravated criminal sexual abuse may be established by the same or less than all of the facts than that which is required to establish aggravated criminal sexual assault"); *People v. Creamer*, 143 Ill. App. 3d 64, 70 (4th Dist. 1986) ("[t]he difference between the assault charge, of which the defendant stands convicted, and aggravated criminal sexual abuse lies

25

solely in the fact that the assault charge requires proof of sexual penetration"); *People v. DeWeese*, 298 Ill. App. 3d 4, 11 (1st Dist. 1988) (finding aggravated criminal sexual abuse to be a lesser included offense of aggravated criminal sexual assault, and entering an acquittal of the greater offense where the proof of penetration was insufficient). An "aggravating factor" cannot be "reused" in such a manner to make out a greater offense and subject a defendant to increased punishment. *See People v. Hall*, 2014 IL App (1st) 122868, ¶ 12 ("[a]n improper double enhancement takes place when either a single factor is used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed, or the same factor is used twice to elevate the severity of the offense itself"); *People v. Brials*, 315 Ill. App. 3d 162, 175 (1st Dist. 2000) (quoting *People v. Thomas*, 171 Ill.2d. 207, 223 (1996) ("[d]ouble enhancement occurs when a factor already used to enhance an offense or penalty is reused to subject a defendant to a further enhanced offense or penalty"); *see also People v. Haron*, 85 Ill.2d 261 (1981).

49.     Suffice to say, given that the sexual assault and sexual abuse allegations stand as the respective greater or lesser offense of each other, they do not constitute "any other felony" within the meaning of 720 ILCS 5/11-1.30(a)(4) or 11-1.60(a)(6). Counts 15, 16, 17, 18, 19, 20, 21, 36, 37, 38, 39, 40, 41, 42, 53, 54, 55, 62, 63, and 64 thus fail to allege all elements of the offense, and in accordance with 725 ILCS 114-1(a)(8) and the constitutional principles that underlie it, must be dismissed.

IV.     **Conclusion**

50.     Based on the foregoing, Mr. Thomas, through counsel, respectfully requests that the Court dismiss the indictment in its entirety with prejudice, alternatively, *requests an evidentiary hearing* to demonstrate the assertions and claims made herein including that the State's Grand

Jury presentation was intentionally misleading, inaccurate, deceptive and false resulting in a denial of Mr. Thomas' constitutional rights and deprived the grand jury of making an informed and meaningful decision as to whether to return the State's proposed indictment.

Respectfully Submitted,

**Damon M. Cheronis**
CCID: 42869
ARDC No. 6277244

**Donna Rotunno**
CCID: 627964
ARDC No. 62772694

**Ryan J. Levitt**
ARDC No. 6320996,
Attorneys for Defendant

**Cheronis, Parente, & Levitt LLC**
140 S. Dearborn Street Suite 404
Chicago, IL 60603
(312) 663-4644
damon@cheronislaw.com
ryan@cheronislaw.com

**Rotunno & Giralamo**
140 S. Dearborn Street Suite 404
Chicago, Illinois 60603
(708) 615-9400
donnarotunno@gmail.com

27